EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION 3 0 C V 0 1 2 6 9 6

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Amy Mcnish<br>1118 Langstonshire Lane<br>Morrisville, NC 27560 | From: | Raleigh Area Office<br>434 Fayetteville Street, Suite 700<br>Raleigh, NC 27601 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **433-2020-01961** | **Johnnie M. Barrett,<br>Intake Supervisor** | **(919) 856-4087** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Johnnie M Barrett_                    _8/12/20_

**Glory Gervacio Saure,**                    *(Date Mailed)*
**Area Office Director**

Enclosures(s)

cc:     **Barbara Christian
Human Resources Director**

**5540 McNeely Drive
Suite 301
Raleigh, NC 27612**

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | **433-2020-01961** |

| **null** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **MS. AMY MCNISH** | **(404) 573-2218** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **1118 LANGSTONSHIRE LANE, MORRISVILLE, NC 27560** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **OPAL HOTELS GROUP, LLC | OPAL HOTELS GROUP II, LLC** | **15 - 100** | **(919) 544-1010** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5540 MCNEELY DRIVE, SUITE 301, RALEIGH, NC 27612** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☒ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **02-25-2020** | **02-25-2020** |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.       On February 25, 2020, I was discharged from the position of Night Auditor. I was hired by Respondent on December 2, 2019. Respondent employs more than fifteen (15) persons.

II.       Mario Parebes (Black, light skin), General Manager, and Jimmy Crane (White), Regional Director of Operations, provided to me a termination letter which read in part, Not following policy of depositing monies after shift. Falsifying company documents. The alleged incident happened on February 17, 2020, but my termination was the first time I was told anything about the issue.

In a meeting on January 23, 2020, I told Barbara Christian (White), Corporate Controller and Human Resources Manager, and Mr. Crane, among other things, that Mr. Parebes, who spoke rudely and harshly to me, did not know how to talk to me, perhaps because I was a dark skinned woman.

Toward the end of January 2020, I changed my natural hair to braids. When Mr. Parebes saw my new hairstyle a week or so later, he said, Oh, you changed your hair. When Mr. Crane saw me he said, Oh,

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Digitally signed by Amy Mcnish on 04-28-2020 05:20 PM EDT | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **433-2020-01961** |

| null | and EEOC |
|---|---|
| *State or local Agency, if any* | |

thats different.

III.     I believe I have been discriminated against because of my race (Black), color (dark-skinned), sex (female) and retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Amy Mcnish on 04-28-2020 05:20 PM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    **FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

2.    **AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# NOTICE TO CEASE AND DESIST

From:
T. Amy McNish
1118 Langstonshire Lane
Morrisville, NC 27560
Amy.McNish@gmail.com

To:
Mrs. Katie Weaver Hartzog
Attorney at Law
Hartzog Law Group
1903 N. Harrison Avenue | Suite 200
Cary, NC 27513
khartzog@hartzoglawgroup.com

Date: Tuesday, July 7th, 2020

**Re: Defamation of Character – For Libel and/or Slander | EEOC Charge 433-2020-01961 | Division of Employment Security Higher Authority APPEALS DOCKET NO. 20-LA-004222**

Dear Attorney Hartzog,

I, Amy McNish is a respected professional in the community and has spent my life building a positive reputation. Nevertheless, when I received Opal Hotels Group, 'Formal Response' to the EEOC Charge I was alarmed to read such degrading and belittling statements about my character and work ethic. Furthermore, I was even more disappointed to see that these statements came from such a prestigious law firm such as Hartzog Law Group. I am completely baffled to the reason why your client did NOT disclose to you the information that they submitted to the Division of Employment Security Higher Authority Appeals when filing for their Appeal against me for the reward of my Unemployment Insurance Benefits; which all documents submitted are legal binding evidence. As well as the recording of the legal hearing that was held on April 9, 2020.

The defamatory statements include, but are not limited to, the following: This is the written statement submitted from Opal Hotels Group Director of Human Resources, Ms. Barbara Christian clearly stating that they **"DID NOT DO WRITTEN DOCUMENTATIONS"** along with the false claims for work performance issues with me. (see full document attached to this notice)

> **"**
> There were several occurrences and issues that led up to our final decision to terminate Amy McNish. However, we were trying to coach Amy and did not do written documentations of these instances, choosing verbal coaching and counseling instead of written documentations that may **"**

*Appeals Request Letter Submitted by Opal Hotel Group Director of Human Resources, Ms. Barbara Christian on April 22, 2020*

**"** On February 14, 2020, McNish was given an Employee Warning Notice for using the airport shuttle to pick up groceries. After her shift ended, McNish instructed the

shuttle driver to take her to the grocery store so that she could perform her personal grocery shopping. Unauthorized use of Opal Hotels' property or equipment is a violation of the Employee Handbook. Exhibit 1 - Employee handbook, p. 19; Ex. 11 - written warning. **"**

*Response to EEOC for Charges Submitted on the behalf of Opal Hotels
Group by Attorney Katie Weaver Hartzog on June 19, 2020*

As confirmed above and with the formal response submitted to EEOC from the Hartzog Law Group vs. the formal request for an appeal submitted by the Director of Human Resources to the DES Higher Authority Appeals Division; it is evident that Opal Hotels Group Management Team have been maliciously spreading inaccurate and unfounded information that is damaging to my personal and professional character.

*"I Amy McNish, swear that I have **NEVER** received any type of 'Written Warning' or any other type of Disciplinary Action while working at the Country Inn & Suites under Opal Hotels Group Management. I have always been an exemplary employee and always went above and beyond the call of duty. I was a very loyal team member and worked extremely hard to ensure the success of this property..."* This formal statement will surely be proven in the weeks to come for upcoming legal proceedings. Please note, under the laws in the State of North Carolina it is unlawful for an individual to make deliberate statements that intend to harm a person's reputation without factual evidence or based on hearsay.

**If you do not cease all related statements a defamation of character lawsuit will be commenced against Opal Hotels Group.**

In addition, this shall serve as a pre-suit letter demanding that you provide written assurance within 7 days (from July 7th, date mailed) that you will cease and desist from making further factually untrue statements.

If you do not comply with this cease and desist letter within the aforementioned time-period, then a lawsuit will be filed in the proper jurisdiction seeking monetary damages as well as pursuing all available legal remedies for your defamation.

Sincerely,

T. Amy McNish
1118 Langstonshire Lane
Morrisville, NC 27560
(404) 573-2218
Amy.McNish@gmail.com

Enclosures

cc: Sent UPSP Mail | Attorney Email

 Gmail                                    Amy McNish <amy.mcnish@gmail.com>

# REQUEST NOTICE OF: WITHDRAWAL OF APPEAL (04 NCAC 24C .0214)

**Amy McNish** <amy.mcnish@gmail.com>                              Thu, Aug 6, 2020 at 8:00 AM
To: Mital Patel <mital@opalhotelsgroup.com>, Ravi Desai <ravi.desai@opalhotelsgroup.com>, Barbara Christian
<hr@opalhotelsgroup.com>, Barbara Christian <bchristian@opalhotelsgroup.com>, "Bova, Kerry"
<kerry.bova@nccommerce.com>, khartzog@hartzoglawgroup.com>
Cc: "amy. mcnish" <amy.mcnish@gmail.com>, "Smith, Jeff" <jeff.smith@nccommerce.com>
Bcc: "SVC_COMMERCE.BOR" <BOR@nccommerce.com>, "Adams, Regina" <regina.adams@nccommerce.com>,
"johnnie.barrett@eeoc.gov" <johnnie.barrett@eeoc.gov>

### IN THE MATTER OF: APPEALS DOCKET NO. 20-LA-004222

**Claimant:**
Tamarsha Amy McNish  | 1118 Langstonshire Ln Morrisville, NC 27560
 **Employer:**
 Opal Hotels Group RDU Airport LLC | 201 Airgate Dr Morrisville, NC 27560

### RE: REQUEST NOTICE  OF: WITHDRAWAL OF APPEAL (04 NCAC 24C .0214)

Good Day,
I  Tamarsha Amy McNish, the Claimant am submitting this request to have an formal notice for the "Withdrawal of
Appeal" submitted by the appealing party, Opal Hotels Group. It has been brought to my attention that the employer
Opal Hotels Group would not be attending the legal Appeals Hearing on Friday , August 7, 2020. And since the
appealing party is declining to be present , I reserve my right  as the opposing party to have proper documentation,
and written notice of the  Withdrawal of Appeal in accordance with the following North Carolina General Statutes, 04
NCAC 24C .0214.

The burden of proof  was only coming from the employer, Opal Hotels Group...
**REASONING:**
The employer has the responsibility to show that the claimant was discharged for misconduct
within the meaning of the law. It is concluded from the competent evidence in the record that the
employer failed to provide competent evidence regarding the reasons for claimant's discharge.
Therefore, the claimant was not discharged for misconduct connected with the work.

> **04 NCAC 24C .0214 WITHDRAWAL OF APPEAL**
> (a) An appealing party may withdraw its appeal with the approval of the Appeals Referee.
> (b) An appealing party's request to withdraw its appeal shall be in writing and contain:
> (1) the reason for the request to withdraw the appeal;
> (2) the date of the request;
> (3) the docket or issue identification number of the determination being appealed;
> (4) the claimant's identification number;
> (5) the names of the claimant and employer;
> (6) the name of the individual making the request to withdraw the appeal;
> (7) the official position of an individual filing the request to withdraw the appeal on behalf of the
> party; and
> (8) a telephone number.
> This request shall be directed to DES's Appeals Section or to the Appeals Referee designated to hear the case,
> or
> recorded by the Appeals Referee using the digital recording system used to record hearings in accordance with
> G.S.
> 96-15(c).
> (c) Following receipt of a request to withdraw the appeal, the Appeals Referee shall review each reason for the
> request.
> (d) If a request to withdraw the appeal is approved, the Appeals Referee shall issue an order granting the
> request to

T. Amy McNish
1118 Langstonshire Lane
Morrisville, North Carolina 27560
Phone: (404) 573-2218
Email: Amy.McNish@gmail.com

IN THE MATTER OF:                    APPEALS DOCKET NO. 20-LA-004222

**Claimant:**
Tamarsha Amy McNish
1118 Langstonshire Ln
Morrisville, NC 27560

**Employer:**
Opal Hotels RDU Airport LLC
201 Airgate Dr
Morrisville, NC 27560

Dear Ms. Kerry Bova, Appeals Referee:

**ISSUE STATEMENT:**

Whether the claimant was discharged due to misconduct connected with work. G.S. 96-14.6.

**FACTUAL BACKGROUND:**

1. Claimant filed an initial claim for unemployment insurance benefits effective February 23, 2020. Claimant last worked for OPAL HOTELS RDU AIRPORT LLC on February 25, 2020 as a Night Auditor.

2. The Adjudicator issued a determination under Issue No. 2104358 holding the claimant disqualified for benefits. Claimant appealed. Pursuant to G.S. 96-15(c), this matter came before Appeals Referee K.A. Bova on April 9, 2020. Present for the hearing: Claimant, Amy McNish, and employer witnesses, Barbara Christian, Human Resources Manager, Mario Paredes, General Manager, and Jimmy Crane, Regional Director of Operations.

3. Claimant began working for employer on December 2, 2019.

4. On February 18, 2020 Mario Paredes, General Manager, reported for work at approximately 8:00 a.m. Mr. Paredes saw an envelope on top of the safe that had not been placed in the safe. The envelope was left unsecured. Mr. Paredes questioned the Front Desk Clerk, Casia, as to whether claimant asked her to sign as a witness to the safe drop per policy. Casia indicated claimant had not asked her to witness the safe drop. Casia was not present for the hearing.

5. Mr. Paredes began to investigate the matter. Mr. Paredes looked at video surveillance and saw claimant leave the deposit on the safe. The video surveillance was not presented as evidence for the hearing. Mr. Paredes did not speak to claimant to obtain a statement from her regarding the deposit.

6. Also, on February 18, 2020 Casia reported to Mr. Paredes claimant called her and asked her to falsify the van logbook. The van logbook lists the times the shuttle driver is to transport guests to and from the airport. Casia told Mr. Paredes claimant called her and asked her to enter times into the logbook that claimant had forgotten to enter. Casia expressed to Mr. Paredes claimant wanted this information entered to show claimant did schedule the shuttle driver for pickups even though she had not. Casia was not present for the hearing to provide evidence regarding these alleged incidents. Mr. Paredes did not speak to claimant to obtain a statement from her regarding her alleged request to Casia.

7. On February 25, 2020 Mr. Paredes discharged claimant for leaving the deposit on top of the safe and for asking Casia to falsify the logbook. Mr. Paredes maintains failing to secure deposits results in a written warning and falsification of documents can result in immediate discharge. Claimant was not issued a written warning for leaving the deposit on top of the safe.

8. Claimant recalls making the deposit during the early morning hours of her shift and having Casia sign as a witness. Claimant does not believe she forgot to the make the deposit. A subpoena was issued to employer on behalf of claimant requesting pictures or video of evidence to support the reasons for claimant's termination. (See Division Exhibits 104 to 106). Employer failed to provide the security footage that Mr. Paredes alleges shows claimant leaving the deposit on the safe and being solely responsible for the deposit. Employer provided a photo taken by Mr. Paredes of the deposit on top of the safe. (See Employer's Exhibit 1). Casia was not present for the hearing to provide evidence regarding claimant allegedly requesting she falsify the van log. Claimant denies she ever called Casia and asked her to falsify the van logbook. Claimant maintains she and Casia were friendly and any telephone calls were out of friendship. Therefore, employer failed to provide competent evidence regarding the reason for claimant's discharge.

**MEMORANDUM OF LAW:**
The Employment Security Law of North Carolina provides that an individual shall be disqualified for benefits for the duration of his unemployment if it is determined by the Division that such individual is unemployed because he was discharged for misconduct connected with his work. G.S. 96-14.6(a).

Misconduct connected with the work is defined as conduct evincing a willful or wanton disregard of the employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee or has explained orally or in writing to an employee or conduct evincing carelessness or negligence of such degree or recurrence as to manifest an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. G.S. 96-14.6(b)(1) and (2). See In re Collingsworth, 17 N.C. App. 340, 194 S.E.2d 210 (1973); Yelverton v. Kemp Industries, 51 N.C. 215, 275 S.E.2d 553 (1981); Intercraft Industries Corporation v. Morrison, 305 N.C. 373, 289 S.E.2d 357 (1982).

The North Carolina General Statutes further provide that the following examples are prima facie evidence of misconduct, which may be rebutted by the claimant:
(1) Violating the employer's written alcohol or illegal drug policy.
(2) Reporting to work significantly impaired by alcohol or illegal drugs.
(3) Consuming alcohol or illegal drugs on employer's premises.
(4) Conviction by a court of competent jurisdiction for manufacturing, selling, or distribution of a controlled substance punishable under G.S. 90 95(a)(1) or G.S. 90 95(a)(2) if the offense is related to or connected with an employee's work for an employer or is in violation of a reasonable work rule or policy.
(5) Being terminated or suspended from employment after arrest or conviction for an offense involving violence, sex crimes, or illegal drugs if the offense is related to or connected with an employee's work for an employer or is in violation of a reasonable work rule or policy.
(6) Any physical violence whatsoever related to an employee's work for an employer, including

physical violence directed at supervisors, subordinates, coworkers, vendors, customers, or the general public.

(7) Inappropriate comments or behavior towards supervisors, subordinates, coworkers, vendors, customers, or to the general public relating to any federally protected characteristic which creates a hostile work environment.
(8) Theft in connection with the employment.
(9) Forging or falsifying any document or data related to employment, including a previously submitted application for employment.
(10) Violating an employer's written absenteeism policy.
(11) Refusing to perform reasonably assigned work tasks or failing to adequately perform employment duties as evidenced by no fewer than three written reprimands in the 12 months immediately preceding the employee's termination.
G.S. 96-14.6(c).

**REASONING:**
The employer has the responsibility to show that the claimant was discharged for misconduct within the meaning of the law. It is concluded from the competent evidence in the record that the employer failed to provide competent evidence regarding the reasons for claimant's discharge. Therefore, the claimant was not discharged for misconduct connected with the work.

**DECISION:**
The adjudicator's determination is REVERSED. Claimant is NOT DISQUALIFIED for unemployment benefits beginning February 23, 2020.
Appeal Filed: April 22, 2020 Decision Mailed: 06/09/2020

Pursuant to N.C. Gen. Stat. § 96-15(e), this cause came before the Board of Review ("Board") to consider the EMPLOYER'S APPEAL from a decision by Appeals Referee Kerry Bova under Appeals Docket No. 20-LA-004222. The record evidence has been reviewed in its entirety. Employer's appeal was received in the Division Office of the General Counsel on April 22, 2020, who processes the appeals for the Board of Review.

Additional evidence is needed to ascertain the substantial rights of the parties. During her testimony at the appeals hearing, the claimant alleged, among other things, that her discharge was due to retaliation for her complaint of harassment and discrimination against Mario Parades. The Appeals Referee should have explored the claimant's allegation in greater detail by allowing the employer to present testimony and/or evidence on this issue. The claimant's evidence on this point, at a minimum, raised a genuine issue of fact which the Appeals Referee should have developed and resolved. See, In re Boulden, 47 N.C. App. 468, 267 S.E.2d 397 (1980).)

Furthermore, the hearing record contains the employer's documents in response to the claimant's subpoena. While the documents are marked as the Employer's Exhibits Nos. 1-18, the Appeals Referee failed to identify, mark and enter the employer's document(s) into the official hearing record during the appeals hearing. Also, it appears that the claimant submitted documents that were not entered into the official record during the hearing (See, Initial Claimant Exhibit-Appeals, located in the Division's benefits system). At the remand

hearing, the Appeals Referee must determine if the claimant's submitted documents are relevant to her separation from employment; if so, the Appeals Referee must identify, mark and enter the claimant's submitted document(s) into the official hearing record during the remand hearing The Appeals Referee must elicit testimony from the parties regarding the parties' submitted documents.

Based on the foregoing, the cause must be remanded to the Appeals Referee to elicit additional evidence and to perform her statutory duties in accordance with N.C. Gen. Stat. § 96-15(c) as described in the preceding paragraphs. During the remand hearing, the Appeals Referee must elicit sufficient testimony from the claimant and employer's witness for appropriate findings of fact and determination on the claimant's allegation and whether the claimant's separation was due to said allegation.

A copy of the documents marked as the Employer's Exhibits and the documents submitted by the claimant must be mailed to the parties with the notice of the remand hearing. The employer must send a copy of the video of the cash deposit incident to the claimant and Appeals Referee prior to the remand

Higher Authority Decision No. 20-HA-001487. hearing. Furthermore, if the parties desire to submit additional evidence during the remand hearing, the parties must send a copy of their documentary evidence to the Appeals Referee and the opposing party prior to the remand hearing.

The Appeals Referee must set aside the Appeals Decision and issue a new decision with new findings of fact and conclusions of law. The new findings of fact shall state the procedural history of the remands, a summary of the requirements of the remand orders, and the parties and witnesses appearing at each hearing conducted in the matter. Although the Appeals Referee may incorporate previous findings of fact into the new decision in the interest of judicial economy, it would be inappropriate and usually reversible error for the Appeals Referee to merely recite findings of fact made in previous decisions. Additional findings must be made, and it must be evident from the new decision following the hearing on remand, that the Appeals Referee heard and considered the evidence, and complied with the remand order of the Board.

The Appeals Referee must set aside the Appeals Decision and issue a new decision with new findings of fact and conclusions of law. The new findings of fact shall state the procedural history of the remands, a summary of the requirements of the remand orders, and the parties and witnesses appearing at each hearing conducted in the matter. Although the Appeals Referee may incorporate previous findings of fact into the new decision in the interest of judicial economy, it would be inappropriate and usually reversible error for the Appeals Referee to merely recite findings of fact made in previous decisions. Additional findings must be made, and it must be evident from the new decision following the hearing on remand, that the Appeals Referee heard and considered the evidence, and complied with the remand order of the Board.

The cause is REMANDED for further proceedings consistent with this decision.

**ISSUE STATEMENT:**

Listed below and attached in a separate ZIP.Flie is the organized evidence by issues stated, for review. Identify the issue the evidence falls into, what the evidence is and any identifying details about it, and why the evidence is important to your case. "Retaliation in the workplace is if you make a complaint of discrimination, your employer is not allowed to retaliate against you in any way.

Exhibits: (Attachments Listed Below)

- Exhibits (1): Recording from 1st Appeals Hearing from April 9th, entire recording.
- Exhibits (2): Recording from 1st Appeals Hearing from April 9th, Part One.
- Exhibits (3): Recording from 1st Appeals Hearing from April 9th, Part Two.
- Exhibits (4): Recording from 1st Appeals Hearing from April 9th, Part Three.
- Exhibits (5): Recording from 1st Appeals Hearing from April 9th, Part Four.
- Exhibits (6): Recording from 1st Appeals Hearing from April 9th, Part Five.
- Exhibits (7): Recording from 1st Appeals Hearing from April 9th, Part Six.
- Exhibits (8): Recording from 1st Appeals Hearing from April 9th, Part Seven.
-
- Exhibits (9): Sales Director Interview Confirmation Email.
- Exhibits (10): Sales Director Interview Resume Submission Confirmation
- Exhibits (11): Sales Director Interview Required Skills Test Confirmation
- Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline
- Exhibits (13): Google Reviews/ Witness Sworn Statements on character
- Exhibits (14): Screenshot image of phone call to hotel to C'Asia call being recorded
- Exhibits (15): Images from 2/12 proof of wrong date submitted for video for cash drop
- Exhibits (16): Cash Receipts, in violation of petty cash policy from GM. Emails Attached
-
- Exhibits (17): Flight Tickets / Baggage Claims proof that Write-up actions are false
- Exhibits (18): Screenshot images proof of communication with GM regarding shuttle use
- Exhibits (19): Screenshot images proof of communication Shuttle Driver shuttle use
- Exhibits (20): Screenshot images proof of communication with GM regarding shuttle
- Exhibits (21): Company memo posted regarding shuttle use. Proof that NO write-up was ever given.
-
- Exhibits (22): All original evidence for the 1st Appeals Hearing (106 Pages)/ Opal Appeal
- Exhibits 23): Emails submitted to HR about discrimination charges/harsh treatment.
- Exhibits (24): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (25): NOTICE TO CEASE AND DESIST - Defamation of Character - For Slander (False claims of receiving a 'Written Warning')
- Exhibits (26): (Subpoena Requested) In order to submit the Attorney's statements submitted to the EEOC concerning the 'Written Warning'.
-
- Exhibits (27): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (28): EEOC Charge Filed for Discrimination current status.

- Exhibits (29): EEOC Charge Filed for Discrimination communications forwarded to Civil
- Exhibits (30): Phone records, verify communication with C'Asia D. / Text Messages

**REASON:**

The line with the Review Boards following request, I have submitted a well organized amount of evidence to prove that I was terminated truly on the basis of retaliation.

  During her testimony at the appeals hearing, the claimant alleged, among other things, that her discharge was due to retaliation for her complaint of harassment and discrimination against Mario Parades. The Appeals Referee should have explored the claimant's allegation in greater detail by allowing the employer to present testimony and/or evidence on this issue. The claimant's evidence on this point, at a minimum, raised a genuine issue of fact which the Appeals Referee should have developed and resolved. See, In re Boulden, 47 N.C. App. 468, 267 S.E.2d 397 (1980).)

- 26 NCAC 04 .0103 NOTIFICATION OF INVESTIGATION
- (a) When a charge of employment discrimination is filed, the Civil Rights Division shall notify the charging party and
- respondent that an investigation will commence. Notice shall be served by registered U.S. mail.
- (b) Any correspondence related to a charge must include the name of the charging party and the respondent and the Civil
- Rights Division's charge number and be submitted to:
- Director of Civil Rights Division
- Office of Administrative Hearings
- 6714 Mail Service Center
- Raleigh, NC 27699-6714
- History Note: Authority G.S. 7A-759;
- Temporary Rule Eff. October 15, 1986 for a Period of 120 Days to Expire on February 11, 1987;
- Eff. February 1, 1987;
- Amended Eff. November 1, 2012; December 1, 1999; April 1, 1991; April 1, 1989;
- Pursuant to G.S. 150B-21.3A, rule is necessary without substantive public interest Eff. July 23, 2016

The employer has the responsibility to show that the claimant was discharged for misconduct within the meaning of the law. It is concluded from the competent evidence in the record that the employer failed to provide competent evidence regarding the reasons for claimant's discharge. Therefore, the claimant was not discharged for misconduct connected with the work.

**Enclosures**



# North Carolina Department of Commerce
## Division of Employment Security
### Appeals Section



16228201

IN THE MATTER OF:

APPEALS DOCKET NO. 20-LA-004222_R

Claimant

Employer

Tamarsha Amy Mcnish
1118 Langstonshire Ln
Morrisville, NC 27560

Opal Hotels RDU Airport Llc
201 Airgate Dr
Morrisville, NC 27560

Mail Date: 08/10/2020

ISSUE STATEMENT:

Whether the claimant was discharged due to misconduct connected with work. G.S. 96-14.6.

FINDINGS OF FACT:

1.  Claimant filed an initial claim for unemployment insurance benefits effective February 23, 2020. Claimant last worked for OPAL HOTELS RDU AIRPORT LLC on February 25, 2020 as a Night Auditor .

2.  The Adjudicator issued a determination under Issue No. 2104358 holding the claimant disqualified for benefits. Claimant appealed. Pursuant to G.S. 96-15(c), this matter came before Appeals Referee K.A. Bova on April 9, 2020. Present for the hearing: Claimant, Amy McNish, and employer witnesses, Barbara Christian, Human Resources Manager, Mario Paredes, General Manager, and Jimmy Crane, Regional Director of Operations. On April 13, 2020 an appeals decision was issued holding the claimant not disqualified for benefits. The employer appealed. On June 9, 2020 the Board of Review issued decision 20-HA-001487 remanding the matter for a hearing to elicit additional evidence. The hearing was conducted by Appeals Referee K.A. Bova o August 7, 2020. Present for the hearing: Claimant, Amy McNish. The employer chose not to participate in the hearing.

3.  Claimant began working for employer on December 2, 2019.

4.  On February 18, 2020 Mario Paredes, General Manager, reported for work at approximately 8:00 a.m. Mr. Paredes saw an envelope on top of the safe that had not been placed in the safe. The envelope was left unsecured. Mr. Paredes questioned the Front Desk Clerk, Casia, as to whether claimant asked her to sign as a witness to the safe drop per policy. Casia indicated claimant had not asked her to witness the safe drop. Casia was not present for the hearing.

5.  Mr. Paredes began to investigate the matter. Mr. Paredes looked at video surveillance and saw claimant leave the deposit on the safe. The video surveillance was not presented as evidence for the hearing. Mr. Paredes did not speak to claimant to obtain a statement from her regarding the deposit.


6. Also, on February 18, 2020 Casia reported to Mr. Paredes claimant called her and asked her to falsify the van logbook. The van logbook lists the times the shuttle driver is to transport guests to and from the airport. Casia told Mr. Paredes claimant called her and asked her to enter times into the logbook that claimant had forgotten to enter. Casia expressed to Mr. Paredes claimant wanted this information entered to show claimant did schedule the shuttle driver for pickups even though she had not. Casia was not present for the hearing to provide evidence regarding these alleged incidents. Mr. Paredes did not speak to claimant to obtain a statement from her regarding her alleged request to Casia.

7. On February 25, 2020 Mr. Paredes discharged claimant for leaving the deposit on top of the safe and for asking Casia to falsify the logbook. Mr. Paredes maintains failing to secure deposits results in a written warning and falsification of documents can result in immediate discharge. Claimant was not issued a written warning for leaving the deposit on top of the safe.

8. Claimant recalls making the deposit during the early morning hours of her shift and having Casia sign as a witness. Claimant does not believe she forgot to the make the deposit. A subpoena was issued to employer on behalf of claimant requesting pictures or video of evidence to support the reasons for claimant's termination. (See Division Exhibits 104 to 106). Employer failed to provide the security footage that Mr. Paredes alleges shows claimant leaving the deposit on the safe and being solely responsible for the deposit. Employer provided a photo taken by Mr. Paredes of the deposit on top of the safe. (See Division Exhibit 107). Casia was not present for the hearing to provide evidence regarding claimant allegedly requesting she falsify the van log. Claimant denies she ever called Casia and asked her to falsify the van logbook. Claimant maintains she and Casia were friendly and any telephone calls were out of friendship.

9. On June 9, 2020 the Board of Review issued decision 20-HA-001487. In the decision the Board of Review stated the employer was to provide a copy of the video of the cash deposit incident to the claimant and the Appeals Referee for the hearing. The employer chose not to participate in the hearing. Therefore, the employer did not provide the requested video evidence. No video evidence of the incident was entered into the record and considered by the Appeals Referee at either the April 9, 2020 hearing or the August 7, 2020 hearing.

10. Claimant believes her discharge was based on racial and gender discrimination. Claimant noticed Mr. Paredes would speak to or greet On other employees but not to her. The other employees were of a different race or gender than claimant. Claimant changed her hairstyle in late January 2020. Mr. Paredes and Jimmy Crane, Operations Manager, both stated to claimant they noticed she changed her hairstyle. Claimant felt the body language expressed by Mr. Paredes and Mr. Crane indicated they did not like her hairstyle. Claimant also felt Mr. Paredes treated her differently because he yelled at her in a phone conversation on or about January 23, 2020.

11. Claimant contacted Human Resources about her concerns in the way she was being treated. Claimant met with Human Resources and Mr. Crane some time after January 23, 2020. Claimant was told employer was pleased was her performance. Claimant requested advise as to whether she was doing anything wrong. Claimant was advised to work on not being longwinded in her communication. Claimant did not feel her concerns were resolved. To claimant's knowledge


Human Resources was still investigating her claims of unfair treatment when claimant was discharged.

12. Employer chose not to participate in the hearing to offer testimony regarding claimant's allegations that her termination may have been a result of discrimination. The employer chose not to participate in the hearing to provide the additional evidence as requested by the Board of Review. Therefore, the employer failed to provide competent evidence regarding the reasons for claimant's discharge

MEMORANDUM OF LAW:

The Employment Security Law of North Carolina provides that an individual shall be disqualified for benefits for the duration of his unemployment if it is determined by the Division that such individual is unemployed because he was discharged for misconduct connected with his work. G.S. 96-14.6(a).

Misconduct connected with the work is defined as conduct evincing a willful or wanton disregard of the employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee or has explained orally or in writing to an employee or conduct evincing carelessness or negligence of such degree or recurrence as to manifest an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. G.S. 96-14.6(b)(1) and (2). See In re Collingsworth, 17 N.C. App. 340, 194 S.E.2d 210 (1973); Yelverton v. Kemp Industries, 51 N.C. 215, 275 S.E.2d 553 (1981); Intercraft Industries Corporation v. Morrison, 305 N.C. 373, 289 S.E.2d 357 (1982).

The North Carolina General Statutes further provide that the following examples are prima facie evidence of misconduct, which may be rebutted by the claimant:
(1) Violating the employer's written alcohol or illegal drug policy.
(2) Reporting to work significantly impaired by alcohol or illegal drugs.
(3) Consuming alcohol or illegal drugs on employer's premises.
(4) Conviction by a court of competent jurisdiction for manufacturing, selling, or distribution of a controlled substance punishable under G.S. 90 95(a)(1) or G.S. 90 95(a)(2) if the offense is related to or connected with an employee's work for an employer or is in violation of a reasonable work rule or policy.
(5) Being terminated or suspended from employment after arrest or conviction for an offense involving violence, sex crimes, or illegal drugs if the offense is related to or connected with an employee's work for an employer or is in violation of a reasonable work rule or policy.
(6) Any physical violence whatsoever related to an employee's work for an employer, including physical violence directed at supervisors, subordinates, coworkers, vendors, customers, or the general public.
(7) Inappropriate comments or behavior towards supervisors, subordinates, coworkers, vendors, customers, or to the general public relating to any federally protected characteristic which creates a hostile work environment.


(8) Theft in connection with the employment.
(9) Forging or falsifying any document or data related to employment, including a previously submitted application for employment.
(10) Violating an employer's written absenteeism policy.
(11) Refusing to perform reasonably assigned work tasks or failing to adequately perform employment duties as evidenced by no fewer than three written reprimands in the 12 months immediately preceding the employee's termination.
  G.S. 96-14.6(c).

REASONING:

  The employer has the responsibility to show that the claimant was discharged for misconduct within the meaning of the law. It is concluded from the competent evidence in the record that the employer failed to provide competent evidence regarding the reason for claimant's discharge. Therefore, the claimant was not discharged for misconduct connected with the work.

DECISION:

  The adjudicator's determination is REVERSED. Claimant is NOT DISQUALIFIED for unemployment benefits beginning February 23, 2020.

*K. A. Bova*

K. A. Bova
Appeals Referee

## APPEAL RIGHTS

This decision is the final decision of the Division unless within ten (10) days from the date it was mailed, the appealing party submits a clear, written statement containing the grounds for the appeal. If such timely statement is not submitted, the appeal may be dismissed. If you were notified of this decision by mail, three (3) additional days will be added to the period to file a written appeal.

Appeals to this decision may be filed via the DES website by logging into your portal (des.nc.gov). For CLAIMANTS, go to the Determination History tab. Under Eligibility Determinations, select a determination and then Request Appeal. For EMPLOYERS, under Benefit Information, click Employer Appeal. Select a determination then Request Appeal.

T. Amy McNish
1118 Langstonshire Lane
Morrisville, North Carolina 27560
Phone: (404) 573-2218
Email: Amy.McNish@gmail.com

**IN THE MATTER OF:**                                    EEOC CHARGE  NO. 443-2020-01961

**Claimant:**
Tamarsha Amy McNish
1118 Langstonshire Ln
Morrisville, NC 27560

**Employer:**
Opal Hotels RDU Airport LLC
201 Airgate Dr
Morrisville, NC 27560

**Attention: Johnnie Barrett | Investigator**
**U.S. Equal Employment Opportunity Commission**
**434 Fayetteville Street Suite 700 Raleigh, NC 27601**
**Email: johnnie.barrett@eeoc.gov**

Greeting Investigator Barrett:

Please accept this letter as the 'Rebuttal Statement to Opal Hotel Group, LLC ("Opal Hotels", "the Company," or "Respondent") position statement submitted on by Hartzog Law Group response to the EEOC Charge submitted by myself by Amy McNish ("McNish" or the "Charging Party"). I genuinely appreciate the additional time you have provided for my rebuttal  the response submitted.

**Disclaimer:**

I Amy McNish am  at the status of pro se litigant for this EEOC federal investigation. I am not a lawyer, nor have I studied to be one. However, I am well educated enough, to understand my rights, the laws, and procedures that come along with filing federal charges against a company. The following rebuttal statements may not be in the formal legal format as accustomed to; so please disregard any grammatical /formatting issues, as I bring forth the precise facts of this case.

**Opinion | Issue Statement:**

It is evident that the Respondent has completely lost focus of what is entailed with Title VII of the Civil Rights Act of 1964, 42 US Code §1981. So, I am providing a brief background snapshot to ensure that the respondent's request to seek  clarification is honored.

- What is race discrimination, and how can it manifest in the workplace? In the workplace context, race discrimination constitutes any unfavorable treatment against a job applicant or employee, specifically because of his or her race or race-related characteristics, such as skin tone, hair texture, or facial features. Race discrimination is often coupled with **"colorism"**, i.e. treating an individual worse because of the color, tone or shade of their skin. This can even occur between individuals of the same race or ethnicity. Title VII of the Civil Rights Act of 1964, 42 US Code §1981, all address employees' rights to be free from racial discrimination in the workplace. Some examples of race discrimination at work include racial slurs, racist "jokes" or cartoons, racial stereotypes, paraphernalia like swastikas or nooses, and singing

along to racist song lyrics. Also, employers who make any employment decisions on the basis of race and/or color in the workplace may be liable for race discrimination.

What are common "telltale signs" that a company may be liable for racial discrimination? A company may be liable for racial discrimination if it is aware, or should have been aware, of one or more incidents of racial discrimination in the workplace, and it does not address those incidents with the harasser and the victim to ensure that they do not happen again. Pleading ignorance is may is not sufficient, and it essentially ratifies a harasser's discriminatory conduct.

A company may also be liable for race discrimination if members of management are actively participating in the racially offensive conduct, and consequently, creating a hostile work environment for employees. When management engages in discriminatory conduct, it sets a negative example for lower level employees to also engage in the same behavior, and ratifies the unlawful conduct. Moreover, it indicates the company's general disregard for anti-discrimination laws. Most importantly, it discourages employees from making complaints because it makes them feel like it would be futile to complain and/or the complaints would not be addressed.

Of note, a company may also be liable for **retaliation** if it does not protect employees who make complaints of race discrimination. Often, employees are reluctant to make complaints to management because they do not want to lose their jobs. Therefore, *employers should provide assurances and safeguards for employees so that their complaints will not put their salaries, benefits, or jobs in jeopardy.*

How should companies respond to complaints of workplace discrimination? Companies must acknowledge that incidents of racial discrimination can be fact-specific, deeply offensive, and often emotional for the complaining party. As a result, companies must take every complaint seriously, and devote time and resources to ensuring that their employees feel safe and respected at work. Shoddy finances or small-scale operations are not an excuse for failing to investigate and remedy race-based harassment.

From a "best practices" standpoint, companies should promptly document complaints of racial discrimination, meet and interview the parties, and monitor the aftermath of the complaint/investigation. The company should also ensure that the complaining employee feels safe and comfortable with going back to work with the harasser. If the employee does not, then the employer must explore options like transferring the complaining party away from the harasser, or even terminating the harasser. **Employers should pay close attention to the nature, severity, and frequency of the complaints.** Importantly, the single use of a racial epithet by a supervisor in the workplace may be sufficient to support a claim of a racially hostile work environment.

What constitutes retaliation, and how would a company retaliate against an employee for making a complaint of racial discrimination? Retaliation constitutes any negative employment decision by an employer in response to a complaint, such as demotion, termination, or sudden

written reprimands for performance. Retaliation can be done to harass or discourage an employee from making a complaint of race discrimination. For example, under the legal theory of "temporal proximity", an employee may be able to demonstrate workplace retaliation if he or she lodges verbal or written complaints of race discrimination, and is then passed up for an expected promotion shortly after. As another example, an employee cannot be retaliated against for supporting, or making a complaint on behalf of another employee who is experiencing race discrimination.

**FACTUAL BACKGROUND:**

**REBUTTAL:**

First, please note the lack of attention to details, given from the responding party, and the lack of consistency throughout their whole response statement. Due to the seriousness of this charge, and with it being on a Federal Government level, factual details as the exact times and dates are particularly important to a ruling on a case of this nature… One, I started working at Country Inn & Suites on **December 2, 2019**, Ms. Katherine Cummings was my GM and hiring manager. Ms. Katherine immediately looked at my resume, and stated, that I was way overqualified for the Night Audit position, as she realized that I have my bachelor's degree, and Master's Degree, along with a host of higher level experience. I explained to her, that I am new in relocation to this area, and that I have the responsibility of helping with my granddaughter. Needless-to-say, I was immediately hired as the full-time Night Auditor.

The first night (and the following 14 days) of training was with Ms. Katherine; a 25+ year hospitality management veteran and she trained me to highest degree of hospitality excellence. As well as stated, that I "achieved well beyond expectations, and that I was an outstanding employee". Furthermore, in regard to the respondent writing, "*from the beginning, McNish failed to follow Opal Hotels policies and procedures*"… I completely rebut those statements made, as they are absolutely false.

Proof of this statement is presented in the following exhibits, where as a guest Ms. Sonja Simone, did an outstanding Google Review for my amazing customer services, work ethic, and loyalty to the brand. This review was posted December 9, 2020, on the Country Inn & Suites Google Maps Business Page; with only after working at Country Inn & Suites, within one week. Along with such exceptional service that I provided; I was able to achieve this accomplishment while working the overnight shift. Which is rare, in comparable to my former colleagues, with no positive google reviews at that time; and my direct results of exceptional service kept the hotel in the 95% (4-5 Stars) Google Ranking for the month of December . As well as management and owners recognized the Google Review, by responding to the guest. I was rewarded a $25 Gift Card as well.

There's no way that the statement from the respondent, is remotely true, just flat out slander…. I followed the policies and procedures to the book, and that was why the reporting management, Mario Paredes, General Manager and Jimmy Crane, Operations Manager had a hard time getting me terminated. They soon learned that they have the same feeling towards Dark-Skinned African American Women and did not like the natural hairstyles either. When they realized that it will not be easy to get rid of me, they plotted and planned together to cause this life shattering discrimination towards me for the color of my skin, and the way my hair grows out

of my head. I will provide proof of these statements, in with accordance of the law. **See Exhibits (13-13.2): Google Reviews/ Witness Sworn Statements on character**

> I. McNish was hired as a night auditor on **December 3, 2019** at the Country Inn & Suites near Raleigh-Durham Airport. Key areas of responsibility for this position including accommodating guests of the hotel by greeting, performing guest transactions, answering the telephone, and operating necessary front office equipment to ensure high-quality guest relations. The night auditor position also required that McNish efficiently handle all payments received and balance/verify monetary transactions and promptly complete and distribute reports to management and relevant staff. Exhibit 2 - Night Auditor Description.
>
> **From the beginning**, McNish failed to follow Opal Hotels policies and procedures. One reoccurring issue that occurred throughout her employment concerned McNish's failure to properly make cash drops and balance her cash register at the conclusion of her shift. McNish was repeatedly told the proper procedure by management and her co-worker, Casia Dabney. Exhibit 8 - Casia Dabney Declaration

REBUTTAL:

Another statement of slander and defamation of my character. I'm starting to wonder who submitted this information to the lawyer, and didn't provide any type of back-up evidence. I am in serious thought, of how statements like this can even be submitted without legal backing. In the following statement from the respondent, "*the previous General Manager had used her own personal money to correct cash shortages caused by McNish*". The allegations are truly serious, as I am being called a theft! And I am even more offended that the responding party would slander the pervious General Manager, Ms. Kathrine Cummings good name and reputation; she has with have nothing to do with this situation, only to be a character witness for me. But needless-to-say, I will address this slander shortly...

In regard to cash handling process, and procedures, I was so accurate in my reporting, that Mario, and Jimmy asked me to stop putting any shortages, or petty cash issues, on the daily communication log, so that the owners would not be aware of the shortages. This can be proven with communication logs attached as evidence. I never ever had any cash handling issues or discrepancies, not even one time... Furthermore, On Monday February 24th 2020 there wasn't text message from Casia stating net Jimmy was upset with Mario concerning the petty cash in the drawer for over $20 for food which was an unauthorized transaction taken out cash money from the general manager Mario Paredes the text message shows the inconsistency in the communication About myself in cash handling whereas the problem was the general manager. See - Exhibits (16): Cash Receipts, in violation of petty cash policy. Casia Text Messages Attached

> On January 2, Opal Hotels replaced the General Manager of the Hotel with Mario Paredes. The previous General Manager had not enforced Opal Hotels policies and procedures. Rather than enforce the policies, **the previous General Manager had used her own personal money to correct cash shortages caused by McNish**, or required Dabney to use her own personal money to correct the

shortages, rather than taking appropriate action. In addition, the previous General Manager had not enforced policies requiring McNish to come to work on time, regularly allowing McNish to report to work ten minutes late.

REBUTTAL:

Yet again another statement of slander and defamation of my character. In the quoted following four exhibits you will notice that they are interview for the sale director position That I applied, was qualified, chosen to receive an interview with the Hotel Owners, Mital Patel and Ravi Desi along with Director of Human Resources Barbara Christian. The General Manager Mario Paredes is stating that I did not follow Opal hotels policies and procedures and violated time in attendance policies set in place by management of Opal Hotels. If this were indeed the case how would I have ever qualified for the sales director position? There is no record on file ever being having this to be an issue nor a disciplinary action in regards of time and attendance. The owners were fully aware of my 2nd job and they were understanding to the responsibility that I explained prior to employment concerning childcare for my 3-year-old granddaughter. Needless-to-say regardless of my personal responsibilities I was never reprimanded for any time and attendance issues and if I was, I would never have qualified 4 the interview 4 the sales director position Which is a management level position. Yet again I provide evidence to prove that the slanderous things that was being accused of me by Opal hotels management are completely false. Please See the following exhibits:

- **Exhibits (9): Sales Director Interview exhibits 9 sales director interview confirmation Email.**
- **Exhibits (10): Sales Director Interview Resume Submission Confirmation**
- **Exhibits (11): Sales Director Interview Required Skills Test Confirmation**
- **Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline**

After Paredes began his employment as General Manager, he began enforcing Opal Hotels' policies and procedures, resulting in friction between he and McNish. For example, Paredes questioned McNish about why she was regularly coming into work ten minutes late. McNish claimed that she had worked out a "deal" with the previous General Manager, allowing her to come in late. Paredes agreed to abide by the alleged agreement reached by the previous General Manager, although no one else in the company was aware of the agreement, and there was nothing in writing about it in McNish's personnel file. However, McNish soon began going further than the alleged agreement allowed, reporting to work fifteen or twenty minutes late, rather than ten minutes late. McNish's failure to report to work on time caused low morale amongst the staff as the person being relieved by McNish was required to stay on shift until she reported to work. Exhibit 9 – Paredes Declaration.

REBUTTAL:

In regards to the company's policies regarding overtime actually feel that these statements alright completely irrelevant to the matters at hand only because Bay were not communicated prior to my termination This is more of a fishing demolition to again cause poor judgement to my character I will also mention that I was asked to work many days overtime when previous employees would call out I have attached text messages concerning this in concerning verification of time management particularly Jimmy Crane, Operations Manager Mario Paredes, General Manager would call me and ask me to work overtime I would work six, five, and

sometime four hours longer pre-shift when call-outs would occur. Whereas management is supposed to work and I did it willingly to be a support system and loyalty to my team again Time and attendance was not an issue. And again please note, if this was an issue, why not put it in the first Appeal, why is it NOT mentioned on any of the submitted paperwork for DES, as they deal with 'employment issues' specifically. It was not mentioned because it wasn't an issue.

> Paredes also began enforcing the Company's policies regarding overtime. Paredes instructed the staff to clock out on time and leave work, and to not report to work early, to avoid the Company incurring unwarranted overtime expenses. McNish pushed back on Paredes' enforcement of this policy, becoming upset when Paredes questioned why she remained on the clock beyond the hours required by her shift. Exhibit 9 – Paredes Declaration.

REBUTTAL:

The fact that Mario the General Manager actually mentioned the employee bulletin board signals that he actually had a problem with the board not me. The bulletin board is irrelevant to the situation at hand; however, I will address my belief the reasoning of taking the board down. It was because I, Amy McNish was the only employee for the two months that had a positive five-star Google review. He removed all this information related to achievements my morale and my co-worker's morale to decimate. The other employees that had two revues no longer worked at the hotel. Again, I clearly state that this information Is completely irrelevant to the situation at hand I completely feel that the respondent party hotels is trying to lead the investigation of discrimination In retaliation With non-substance issues. See Exhibits (13.1): Google Reviews/ Images of the Bulletin Board before and after.

> In addition, Paredes made the decision to change the information on the employee bulletin board, including removing information related to achievements made by staff in the previous year. McNish became upset because information regarding an achievement she had made was removed from the bulletin board. However, Paredes removed all information related to achievements made by staff in 2019, not just information related to Paredes' achievement. Exhibit 9 - Paredes Declaration.

REBUTTAL:

The following emails are proof that Human Resources was completely aware of the harassments and discrimination claims I filed against my management team. However, she fail to follow through like the company requires as set by the guidelines set in the Opal Hotels Group Employee Handbook. See the following emails, along with Exhibits 23: Emails submitted to HR about discrimination charges/harsh treatment.

from:     Amy McNish <amy.mcnish@gmail.com>
to:       Barbara Christian <bchristian@opalhotelsgroup.com>
date:     Feb 13, 2020, 1:10 PM
subject:  Fwd.: COMMUNICATION ISSUES | NIGHTAUDIT- 02.12.20
*Good Afternoon Ms. Barbara*
*Please review the following email, and the attachments, as I have a major concern about how communications are being handled in regards of me...*

*I would love for you to please provide me feedback and as I am trying my hardest to grow and do well at the Country Inn & Suites. I truly like my job and would like some guidance on what I can do to improve the atmosphere and the negative treatment I am getting from my management team....*

*This is a formal request for job performance guidance. I am very interested in knowing what actions I can do to protect my employment and better the treatment towards me.*

*As you will see below, the statements made against me are absolutely wrong and I am very disappointed in the communications. Please advise ASAP.*

*I am not sure what else can be done but to seek guidance from Human Resources... I sent the email earlier this morning and no one has bothered to contact me. I truly appreciate your time and understanding in this matter.*

from:   Amy McNish <amy.mcnish@gmail.com>
to:     Barbara Christian <bchristian@opalhotelsgroup.com>
date:   Feb 13, 2020, 1:34 PM

*Amy,*

*I apologize that no one has contacted you in the time frame you expected to hear from someone. Today has been very busy for me. I have spoken with Jimmy briefly today because he is feeling under the weather, and ownership has just returned from visiting our other properties out of state. It will take me some time to review the matter and respond. I will be investigating and researching your email and you will hear from me soon.*

from:   Amy McNish <amy.mcnish@gmail.com>
to:     Barbara Christian <bchristian@opalhotelsgroup.com>
date:   Feb 14, 2020, 9:52 AM

*Good Morning Barbara,*

*Thank you for the update and I truly appreciate your time and understanding.... I am really hurt by these actions towards me, and even more I'm starting to feel BULLIED.... For one the Management did not even delete the email that was sent to the Front Desk, and now this Morning, Mario comes in, and starts making me feel very uncomfortable and frustrated.*

*I am so stressed out, I'm in my car crying, trying to gather myself. I don't know what to do, because now I feel like I'm being attacked by Manager. ... I am hoping that you can help me come to some resolution. Thank you again for your time....*

McNish complained to Human Resources Director, Barbara Christian, regarding Paredes. McNish complained that Paredes was harassing her but the substance of her complaints largely related to her displeasure with the decisions being made by Paredes in enforcing policies and procedures, measures which were in congruence with the directives Paredes had been given by the owners of the Company when she was hired. Christian told McNish that Paredes was a new manager and needed to be given time to acclimate into the property as the manager. Christian also counseled Paredes about being aware of the tone of her communications when enforcing policies with staff members. Paredes agreed to consider her tone when speaking with staff members, including McNish. Exhibit 10 – Barbara Christian Declaration.

REBUTTAL:

The responded statement of saying that I was giving an employee written warning notice on February 14th, 2020 is completely false. On February 14th I left work and Clocked out at 8:55am See Exhibits (21.3): Image of clock-out.   The GM Mario Perez.

- Exhibits (17): Flight Tickets / Baggage Claims proof that Write-up actions are false
- Exhibits (18): Screenshot images proof of communication with GM regarding shuttle use
- Exhibits (19): Screenshot images proof of communication Shuttle Driver shuttle use

- Exhibits (20): Screenshot images proof of communication with GM regarding shuttle
- Exhibits (21): Company memo posted regarding shuttle use. Proof that NO write-up was ever given.
- Exhibits (22): All original evidence for the 1st Appeals Hearing (106 Pages)/ Opal Appeal
- Exhibits (22.1): All original evidence for the 1st Appeals Hearing Opal Hotels – Appeal Request Letter
- Exhibits (22.2): All original evidence for the 1st Appeals Hearing Opal Hotels – Discrimination Investigations Written Statement from Operations Manager, Jimmy Crane

Furthermore I Amy McNish submitted a
Mrs. Katie Weaver Hartzog
Attorney at Law
Hartzog Law Group
1903 N. Harrison Avenue | Suite 200
Cary, NC 27513
khartzog@hartzoglawgroup.com
Date: Tuesday, July 7th, 2020
Re: Defamation of Character – For Libel and/or Slander | EEOC Charge 433-2020-01961 | Division of Employment Security Higher Authority APPEALS DOCKET NO. 20-LA-004222
The defamatory statements include, but are not limited to, the following: This is the written statement submitted from Opal Hotels Group Director of Human Resources, Ms. Barbara Christian clearly stating that they "DID NOT DO WRITTEN DOCUMENTATIONS" along with the false claims for work performance issues with me. (see full document attached to this notice) As confirmed above and with the formal response submitted to EEOC from the Hartzog Law Group vs. the formal request for an appeal submitted by the Director of Human Resources to the DES Higher Authority Appeals Division; it is evident that Opal Hotels Group Management Team have been maliciously spreading inaccurate and unfounded information that is damaging to my personal and professional character.
"I Amy McNish, swear that I have NEVER received any type of 'Written Warning' or any other type of Disciplinary Action while working at the Country Inn & Suites under Opal Hotels Group Management. I have always been an exemplary employee and always went above and beyond the call of duty. I was a very loyal team member and worked extremely hard to ensure the success of this property..." This formal statement will surely be proven in the weeks to come for upcoming legal proceedings. Please note, under the laws in the State of North Carolina it is unlawful for an individual to make deliberate statements that intend to harm a person's reputation without factual evidence or based on hearsay.

On February 14, 2020, McNish was given an Employee Warning Notice for using the airport shuttle to pick up groceries. After her shift ended, McNish instructed the shuttle driver to take her to the grocery store so that she could perform her personal grocery shopping. Unauthorized use of Opal Hotels' property or equipment is a violation of the Employee Handbook. Exhibit 1 - Employee handbook, p. 19; Ex. 11 - written warning.

REBUTTAL: - **Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline**

On February 17, 2020, McNish failed to follow the cash drop policy. The Front Desk Clerk/Cashier Procedures policy requires, in part, as follows:

1. When shifts change, the cashier leaving and the cashier coming on duty need to count the drawer. Both employees must fill out the cashier transfer form and sign and date. 2. Drawer should be counted and recorded again at the end of the shift even if there was no activity. Cashiers should always print their closing paperwork from their Property Management System even if there was no cash activity. All cashier envelopes, even if no activity should be signed, Jogged, witnessed, and dropped in the safe. 3. Once deposit envelope is filled out properly and all documentation (closing cashier reports, adjustment sheets, and documentation for over/shortage if applicable or vending machine refund vouchers if applicable) has been sealed the shift deposit should be logged, witnessed, and placed in the drop safe. See, Exhibit 6 - Front Desk Clerk/Cashiers Procedure. In addition, Opal Hotels policy, acknowledged by McNish, makes it clear that leaving bank or deposit unsecured and/or failing to have a witness when dropping a deposit is considered gross negligence and may result in disciplinary action up to and including termination. Exhibit 5.

REBUTTAL:

**- Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline**

Rather than properly performing the cash drop, McNish's bank was found attached to a clipboard, lying on top of the safe. Exhibit 12. After her shift ended, McNish called her co-worker, Casia Dabney, and asked her to make the cash drop. Dabney refused to make the drop, as it would have required Dabney to falsify company documents by signifying that she had witnessed the counting of the money and the drop itself. Instead of engaging in this gross misconduct requested by McNish, Dabney reported this to Paredes. Exhibit 8 - Dabney Declaration.

REBUTTAL:

The following email is the original reason That Jimmy Crane and Mario Perez what's given the opportunity to truly show the harassment and discrimination Against me with this process of be little Wayne Anne communicating on truth lead to the snowball effect the following email describes the shuttle driver Elijah filling to pick up a guest and the exhibits below show the details to consider:

from: Amy McNish <amy.mcnish@gmail.com>
to: General Manager Country Inn & Suites <gm.cis@opalhotelsgroup.com>,
Jimmy Crane <jcrane@opalhotelsgroup.com>,
Mital Patel <mital@opalhotelsgroup.com>,
Ravi Desai <ravi.desai@opalhotelsgroup.com>,
"AmyMcNish@gmail.com" <Amy.McNish@gmail.com>

**date: Feb 13, 2020, 9:43 AM**
**subject: COMMUNICATION ISSUES | NIGHTAUDIT- 02.12.20**

*Good Morning Gentlemen,*

*I'm a bit confused and surprised with how the communication went, with the problems with the Shuttle Service. Unfortunately, I even have been given the perception that I am the one in the wrong... So, at this point, I am in complete defense mode... I've learned a long time ago, if you don't take up for yourself, no one will, and my name is all I have, and I request that I am treated fairly and with respect in all actions towards me....*

*The responses where all sent to the Front Desk email, and openly discussed. Which was a bit strange. Especially when there have been so many other communications that have kept secret lately. But in any case, to defend my statements about a customer Service complaint, and the response that was submitted by Mario, Stating, "Amy failed to document those two Shuttle Drop Offs in the book, he was using the Men's Room."....*

*This statement is a COMPLETE LIE!!! AND I AM REQUESTING THAT THE CAMERAS BE REVIEWED, TO CLEAR MY NAME! I PUT MY LIFE ON THIS! THERE'S NO POSSIBLE WAY, I WILL ALLOW ANYONE TO THROW ME UNDER THE BUS LIKE THIS AND ME NOT TAKE UP FOR MYSELF! THIS IS SLANDER OF MY NAME AND DEFAMATION OF MY CHARACTER! AND TRULY COULD GET ME FIRED, IF THE GUEST WOULD FOLLOW THROUGH WITH THE COMPLAINT, ABOUT THE SHUTTLE DRIVER GONE MISSING! (12 IMAGES ATTACHED TO PROVE IT)*

*I am truly hurt, and disappointed with how this communication went, and for it to be sent to the Front Desk for my other Colleagues to view it. Completely disrespectful and unfair.*

*(And to come at a time when I submitted my resume for the Sales Director position, which apparently, I am not getting due the lack of response from the Submission, which is cool. But regardless, I will not have my name thrown in ground!)*

*I even called Mario, around 7:45am and told him that Elijah was being very rude and disrespectful towards me, and I walked away from him twice. Not one employee should have to put up with such unfair, harsh treatment, and harassment from anyone. Opal Hotels Employee Handbook, has a strict policy against this type of treatment...*

*Attached to this email, is the screenshots of the text messages, pictures and contacts of the guest. I am highly organized and detailed in all of my actions, I Cover myself all the time, because no one cares about my family and livelihood but me, so I'm always covering me. That's why I communicate effectively all the time. I don't hide anything, very clear on all my statements.*

*Elijah walked in at 6:42 am through the front doors and said very clearly and the cameras will hear it as well, he stated, (grinning), "I just left talking to Stephanie. at the Tru Hotel, she said that they were sold out too!"... Then when he finished his statement, I followed with this statement, "Elijah, I've been calling him it was three guest waiting to take the Shuttle to the Airport, and was very upset that you were not around; and they stated that they will file a complaint online"... He then started being very rude and disrespectful towards me. I walked away, and I had to do that twice.*

*Again, I am requesting the cameras be REVIEWED!...*

*This was truly very HURTFUL to read, especially when I was asked to stay later than my schedule Shift, because Casia had an appointment, and Mario, stated 3 times to me that I don't have to worry about the Shift he would do it, but yet I was being a team player and stayed until almost 10am. (9:45am).... I do my job and I do it*

*very well, and I hold myself accountable for my actions, and this is not fair. And I am requesting a WRITTEN STATEMENT, CLEARING MY NAME.*

*Lastly, you can imagine the disappointment I felt when I was only expressing my excitement about being Sold Out... I wasn't really going the reports, I was going by what the computer said. And as I ATTACHED, the Room available to sell the other night said NONE. Granted the Master FLASH said we had 6 Rooms left, and I didn't know that, but after Audit around 2am - 3am I sold 5 more rooms and that left one. So, the excitement comes from what I had available, and at the time it was showing None. That's why I sent the Screenshot image.*

*But, to see a reply stating that I need to do the Audit between 2-3am is not adding up. Technically I was not sold out, but that had nothing to do with the Audit. It was what was showing up in system for Rooms available.... Jimmy requested the later time for the Audit is Not a feasible process. Because of the Amount of work that is required. For this to be the smallest hotel I have ever worked at, it has the longest and heaviest Audit Check list I've ever seen....*

*Please take a moment and review it, and you will agree. I don't do my Audit process until I check all the guest in. And according to the check list, I must process the Credit Card transactions before 1am. So that's topically when I have rolled the day. It's A LOT OF WORK!!! I make it seem easy, but it's not!... Especially when I am doing more than the job entails. And if you don't have any issues with any past days, why request the change. I will never be this excited about a sold-out night again... All of the Reserved guests were checked in, I had received 5 walk ins... Please advise on this request.*

*Also, Mario mentioned to me about the times of the start of the Audit, but he did not make it a direct change moving forward. I expressed that he should come and see the process and he will see what I'm talking about.... That was it.*

*This is a very long email, and I'm sending it from my cell phone, so please excuse any typos and grammatical errors.*

*I am hoping to get a positive response back regarding this today. Again this was very hurtful and unfair. I just wish people would be honest and be accountable for their actions!*

*But at the end of the day, I will fight hard for my name. My network and tenure in this industry is deep, and to be able to grow, a polished name is all I have! Thank you for your time and understanding.*

*Best Regards,*
*Amy McNish*

**- Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline**. Also, on February 18, 2020 Casia reported to Mr. Paredes claimant called her and asked her to falsify the van logbook. The van logbook lists the times the shuttle driver is to transport guests to and from the airport. Casia told Mr. Paredes claimant called her and asked her to enter times into the logbook that claimant had forgotten to enter. Casia expressed to Mr. Paredes claimant wanted this information entered to show claimant did schedule the shuttle driver for pickups even though she had not. Casia was not present for the hearing to provide evidence regarding these alleged incidents. Mr. Paredes did not speak to claimant to obtain a statement from her regarding her alleged request to Casia. - Exhibits (22): All original evidence for the 1st Appeals Hearing (106 Pages)/ Opal Appeal

Paredes began investigating the circumstances surrounding McNish's failure to make the cash drop. Exhibit 9 - Paredes Declaration. However, after McNish's very next shift on February 18, McNish again requested that Dabney falsify company documents for her. On this occasion, McNish failed to log a guest's request to use the airport shuttle at 7:30 a.m. in the logbook.

Exhibit 18 - Shuttle Schedule for February 19, 2020. The purpose of the logbook is to alert the driver, and other employees, that a guest needs to be taken to the airport so that the airport trips can be arranged and to ensure the shuttle is not overbooked. McNish's failure to record the airport shuttle request in the logbook resulted in the shuttle driver being unaware of the guest's need for transportation to the airport, causing the guest to have no transportation to the airport. When McNish became aware of her error, she called Dabney two times after her shift ended, asking that she falsify the shuttle logbook to make it appear that McNish had properly documented in the logbook that the guest needed to use the airport shuttle. Dabney refused to falsify the logbook. Doing so would have made it appear that the shuttle driver had not properly performed his job duties, possibly resulting in him being unfairly disciplined. Rather than falsifying the logbook, Dabney reported this issue to Paredes. Opal Hotel's personnel policy clearly states that falsification of employer records is grounds for immediate termination of employment. See Employee Handbook, p. 17. Paredes requested that Dabney write a statement summarizing this event. Exhibit 8 - Dabney Declaration; Exhibit 13 - Dabney Statement. Paredes continued with her investigation

REBUTTAL: In regards of the video submit it for evidence the video date is incorrect see exhibit 15 an image showing the date was four February 12th on the day that the shuttle bus driver did not take a guest to the airport the picture is from my cell phone me standing in front of the security camera looking for the shuttle bus driver in the efforts to make sure that I communicate clearly in affectively and have proof that I could not locate the shuttle bus driver Mr. Elijah at 6:45 in the morning I took a picture of the security camera it showed all locations in the hotel that Mr Elijah was nowhere to be seen Or found again good dates for the submitted video is incorrect an as well as the video has been rerecorded untampered with I have on the same clothes on the date that he tried to submit the time on the 12th not the 18th .

Mr. Paredes began to investigate the matter. Mr. Paredes looked at video surveillance and saw claimant leave the deposit on the safe. The video surveillance was not presented as evidence for the hearing. Mr. Paredes did not speak to claimant to obtain a statement from her regarding the deposit.

- Exhibits (15): Images from 2/12 proof of wrong date submitted for video for cash drop - Exhibits (16): Cash Receipts, in violation of petty cash policy from GM. Emails Attached

Paredes continued with her investigation into the incident regarding McNish's cash bank not being properly dropped into the safe. Paredes reviewed the surveillance video footage from the time that the drop should have been made. The video footage showed McNish performing paperwork at the table where the cash was found. However, McNish did not have another employee witness her counting the money. Furthermore, McNish never placed the money in the safe, as is required by policy, and instead left

the cash on a clipboard on the table. Exhibit 9 - Paredes Declaration; Exhibit 14 - Video Footage.

REBUTTAL:

On February 18, 2020 Mario Paredes, General Manager, reported for work at approximately 8:00 a.m. Mr. Paredes saw an envelope on top of the safe that had not been placed in the safe. The envelope was left unsecured. Mr. Paredes questioned the Front Desk Clerk, Casia, as to whether claimant asked her to sign as a witness to the safe drop per policy. Casia indicated claimant had not asked her to witness the safe drop. Casia was not present for the hearing.

5. Mr. Paredes began to investigate the matter. Mr. Paredes looked at video surveillance and saw claimant leave the deposit on the safe.

7. On February 25, 2020 Mr. Paredes discharged claimant for leaving the deposit on top of the safe and for asking Casia to falsify the logbook. Mr. Paredes maintains failing to secure deposits results in a written warning and falsification of documents can result in immediate discharge. Claimant was not issued a written warning for leaving the deposit on top of the safe.
On February 25, 2020 Mr. Paredes discharged claimant for leaving the deposit on top of the safe and for asking Casia to falsify the logbook. Mr. Paredes maintains failing to secure deposits results in a written warning and falsification of documents can result in immediate discharge. Claimant was not issued a written warning for leaving the deposit on top of the safe.
). Casia was not present for the hearing to
provide evidence regarding claimant allegedly requesting she falsify the van log. Claimant denies she ever called Casia and asked her to falsify the van logbook. Claimant maintains she and Casia were friendly and any telephone calls were out of friendship. Therefore, employer failed to provide competent evidence regarding the reason for claimant's discharge.

REBUTTAL:
During a legal hearing held by Department of Commerce Employment Appeals Division, the second decision was ruled in the Claimant's favor. Due to the fact that the respondent inability to prove the allegations against me was already proven to be false, in regard to the legal process of the rules and regulations set for by the state of North Carolina in regards to fair and just employment labor laws.

MEMORANDUM OF LAW: The Employment Security Law of North Carolina provides that an individual shall be disqualified for benefits for the duration of his unemployment if it is determined by the Division that such individual is unemployed because he was discharged for misconduct connected with his work. G.S. 96-14.6(a)See below the decision statements:

> *Claimant recalls making the deposit during the early morning hours of her shift and having Casia sign as a witness. Claimant does not believe she forgot to the make the deposit. A subpoena was issued to employer on behalf of claimant requesting pictures or video of evidence to support the reasons for claimant's termination. (See Division Exhibits 104 to 106). Employer failed to provide the security footage that Mr. Paredes alleges shows claimant leaving the deposit on the safe and being solely responsible for the deposit. Employer provided a photo taken by Mr. Paredes of the deposit on top of the safe. (See Employer's Exhibit 1). Casia was not present for the hearing to*

*provide evidence regarding claimant allegedly requesting she falsify the van log. Claimant denies she ever called Casia and asked her to falsify the van logbook. Claimant maintains she and Casia were friendly and any telephone calls were out of friendship. Therefore, employer failed to provide competent evidence regarding the reason for claimant's discharge.*

Paredes reviewed McNish's job history with his supervisor, Jimmy Crane and the HR Director, Barbara Christian. McNish's failure to perform her job duties was not based on mere negligence, but rather, evidenced a pattern of blatant disregard of Opal Hotels' policies and procedures, with McNish going so far as to request that another employee falsify company records on more than one occasion to cover up her mistakes. **In light of the fact that these serious performance issues were occurring so early in McNish's employment, despite all of the training she had received, the Company elected to part ways with McNish to fill the position with someone who would be committed to following Opal Hotel's policies and procedures.** Accordingly, Opal Hotels terminated McNish's employment effective February 25, 2020. Exhibit 15 - Termination Notice.

REBUTTAL: Upon speaking to EEOC I was instructed that I would need to provide proof that the accused management has a behavior pattern of discrimination and harassment. The former co-worker, Stephanie Part-Time Night Auditor; she confirmed this pattern. She has since left the hotel, however she called me and expressed to me that one management told her not to talk to me, and she sincerely apologized for not standing up for me and my rights. She also stated that the new/replacement Night Auditor Ms. Sophia Rosado had been sexually harassed by the current General Manager, Mario. As well as confirming the behaviors that I filed this EEOC Claim for. With prior permission from Sophia Rosado, please review the candid conversation between myself and Sophia, where she explains in details what the current General Manager, Mario Paredes had did to her. Along with confirming the behaviors of sex, and racial discrimination and colorism. See Exhibits (7): Recording from 1st Appeals Hearing from April 9th, Part Six. - Exhibits (8): Recording from 1st Appeals Hearing from April 9th, Part Seven.

In this matter, Opal Hotels does not dispute that McNish can satisfy the first and third elements of her prima facie claim under Title VII, requiring that she show that she is a member of a protected class and that she suffered an adverse employment action. McNish cannot, however, satisfy either the second or fourth elements of the claim. **With respect to the second element, McNish's job performance was grossly deficient, which was clear from the beginning of her employment and ultimately resulted in the termination of her employment when she requested that another employee falsify company documents to hide her mistakes. Based on these reasons alone, McNish's Title VII race, color, and sex discrimination claims fail.** Additionally, however, McNish also cannot satisfy the fourth element of her prima facie claim, as she is wholly unable to show that any employee outside the protected class, who is similarly

**situated to McNish**, received more favorable treatment than McNish despite engaging in even remotely similar conduct.

REBUTTAL: As a final rebuttal hi Amy McNish have presented to Ms. Johnnie Barrett EEOC Investigator that claims back I was indeed discriminate it against based on sex color race in her I have provide it the support pictures video emails documents to all prove that I was discriminated against by the management staff open hotels group my termination was pearly paired Lee and the result of retaliation Due to the fact that hi submit it a complaint when I change my hair at the end of January 2020 that took the management staff to a higher level 2 fire me I did the proper protocol as noted in The Opal hotel employee Handbook for the procedure to report discrimination and harassment Ann yet on February 25th 2020 I was terminated the claims me poorly documenting shuttle log in failing to conduct a cash drop is purely apply to cover the actions of discrimination An retaliation against me.

**Yet I have successfully presented clear and precise evidence proving that Opal Hotels have mischievously tried to cover up this charge of discrimination from their management team. Here's just a recap of the details proved:**

**1.) Dates: ALL the dates provided by the respondent are completely wrong. Which should immediately bring into question the integrity of the statements submitted. Including the VIDEO submitted is for evidence was edited, copied, re-recorded all for the WRONG DATE!**

**2.) False Statements about Written Warning: Proven in the inconsistency of statements submitted by management.**

**3.) Failure to submit open evidence: Respondent refused to openly share declaration exhibits, mainly because documents are completely false, and if I was to review them I would clearly breakdown the false accusations, as was done in the small amount evidence I was provided.**

**4.) Friendship Communications: Proof that the former co-worker was friends, and proof of not knowing anything about the statements submitted. Anything submitted after the fact should not be admissible, as it is implied to be false. As well as I was able to produce two verbal communications from a current employee, confirming the other discrimination and harassing behaviors from the General Manager, Mario Paredes.**

**5.) Failure to follow through with legal process, as required for the DES Higher Authority Appeals that was requested on the respondent behalf. Showing the lack of respect for the laws and procedures set in the state of North Carolina by not attending the hearing as required, nor submitting proper documentation to have the appeal withdrawn.**

Employer chose not to participate in the hearing to offer testimony regarding claimant's allegations that her termination may have been a result of discrimination. The employer chose not to participate in the hearing to provide the additional evidence as requested by the Board of Review. Therefore, the employer failed to provide competent evidence regarding the reasons for claimant's Discharge. The employer has the responsibility to show that the claimant was discharged for misconduct within the meaning of the law. It is concluded from the competent evidence in the record that the employer failed to provide competent evidence regarding the reason for claimant's discharge. Therefore, the claimant was not discharged for misconduct connected with the work. DECISION: The adjudicator's determination is REVERSED. Claimant is NOT DISQUALIFIED for unemployment benefits beginning February 23, 2020. K. A. Bova Appeals Referee

- Exhibits (7): Recording from 1st Appeals Hearing from April 9th, Part Six.
- Exhibits (8): Recording from 1st Appeals Hearing from April 9th, Part Seven.

McNish offers absolutely no support for her claim that she was discriminated against based on her sex. McNish claims that she complained to Christian that Paredes spoke rudely and harshly towards her and she surmises in her Charge that Paredes spoke rudely to her because he did not "know how to talk to … a dark skinned woman." Paredes denies speaking to McNish in a harsh or rude manner. Christian recalls that McNish complained to her that Paredes was rude and difficult to deal with but denies that McNish complained that this was based on her race or color. Finally, McNish claims that she was discriminated against because she changed her natural hair to braids at the end of January 2020. However, McNish's hair style had nothing to do with the decision to terminate her employment. McNish's employment was terminated after she changed her hairstyle, solely because she failed to properly document the shuttle logbook, failed to properly conduct a cash drop, and requested that her co-worker falsify company documents to cover up her errors, and cast blame on others.

In light of McNish's inability to advance a prima facie claim for race or sex discrimination under Title VII, McNish's race, sex, and color discrimination claims should be summarily dismissed.

## REASONING:

Discrimination is a socially structured action that is unfair or unjustified and harms individuals and groups. Discrimination can be attributed to social interactions that occur to protect more powerful and privileged groups at the detriment of other groups. While not all stressful experiences negatively affect health, or occur because of discrimination, many do impact health and can be related to discrimination.

A wealth of psychological research shows that discrimination can exacerbate stress. Moreover, discrimination-related stress is linked to mental health issues, such as anxiety and depression. In brief, other people's reactions exert a strong impact on people's thoughts, emotions, motives, and behavior, as well as their physical and psychological well-being. Discrimination on the basis of race (commonly referred to as racism) has been linked to disparities in health outcomes for racial/ethnic minorities. Discrimination can be understood as a social stressor that has a physiological effect on individuals (e.g., irregular heartbeat, anxiety, heartburn) that can be compounded over time and can lead to long-term negative health outcomes

These efforts are of vital importance to individuals of all races, ethnicities, national origins, and religions in workplaces throughout the country. In the President's words, that which "makes our nation so strong and that will ultimately defeat terrorist activity is our willingness to tolerate people of different faiths, different opinions, different colors, within the fabric of our society." It is this diversity and inclusiveness that strengthens our country and guarantees our future prosperity. Together we can make our workplaces models of respect and understanding. And in this way we do our part to defeat those forces that seek to undermine the American way of life.

One great oversight of our modern generation is that we turn a blind eye to the subconscious colorism that occurs in our society. Colorism within the African American community is defined as the attitude among African Americans discriminating against other African Americans because of their skin complexion – for instance, being too light or too dark. The form of racial discrimination known as colorism dates to slavery and has been systematically passed through various elements of our culture. It implies that lighter skin and straight hair are better, and successful men should marry women who fit this standard. Colorism can also happen within other communities, as I will explain below. Much research has shown how racial discrimination negatively affects African Americans' mental health, contributing to depression and anxiety.

Mental Health Effects of Colorism in the Black Community…Colorism plays a huge role in the low self-esteem of Black America from individuals to relationships, and even expands into societal status. Colorism occurs both interracially and interracially. Interracial colorism is when a member of one racial group discriminates based on the skin color of a member belonging to a different racial group, and interracial colorism involves a member of a racial group discriminating a member of the same racial group based on skin color. Both forms of colorism impact the black community by causing division and can contribute to negative mental health effects.

Exposing the multiple influences of interracial stigmas could spark conversation and enlighten the black community on how interracial and interracial colorism affect the subconscious. Subsequently, we could teach those who are affected by interracial colorism to unlearn their self-prejudices and to praise the beauty of their genetic makeup, and to accept themselves without the dramatization of altering their features. To progressively oust interracial colorism, we have to unite and work together as a community to end colorism.

The Civil Rights Act of 1964 is an act to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States, to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.

The legal standard for proving that retaliation caused a materially adverse action are as follows: For retaliation claims against private sector employers and state or local government employers, the Supreme Court has ruled that the causation standard requires that "but for" a retaliatory motive, the employer would not have taken the adverse action. "But for" causation means, even if there are multiple causes, the materially adverse action would not have occurred without retaliation.

Types of evidence may support a claim of retaliation in some cases, the employer's own statements may acknowledge or betray its intention to deter an applicant or employee from engaging in protected activity. However, in many cases, there are different pieces of evidence, either alone or together, that may support an inference that retaliation caused a materially adverse action. Examples include: suspiciously close timing between the EEO activity and the materially adverse action; verbal or written statements demonstrating a retaliatory motive, comparative evidence (e.g., the individual was disciplined for an infraction that regularly goes undisciplined in that workplace, or that another employee who did not engage in EEO activity committed and was not disciplined as severely); demonstrated falsity of the

employer's proffered reason for the adverse action; or any other pieces of evidence which, viewed alone or in combination with other facts, may support an inference of retaliatory intent.

What if the employer claims its challenged action was not motivated by retaliation? In many cases, an employer will present a non-retaliatory reason for the challenged action. The employer may assert that it acted for a legitimate and unrelated reason such as poor job performance, misconduct, or the individual's lack of qualifications for the job. An employee may respond to these assertions by providing evidence that the employer's explanation is actually a pretext for retaliation. If an employer's explanation is shown to be false, a factfinder may infer retaliation.

## CONCLUSION

I Amy McNish, the charging party has the responsibility to show that the respondent, Opal Hotels Group Management Team discharged me for misconduct within the meaning of the law. I hope this rebuttal statement along with the host of evidence that has been submitted provides the EEOC the information needed to enter a "Cause" finding for violation of Title VII of the Civil Rights Act of 1964, 42 US Code §1981; in regards to discrimination in sex, race, and color As it is concluded from the competent evidence in the record that the employer failed to provide competent evidence regarding the reasons for myself the charging party's discharge. Therefore, the I was not discharged for misconduct connected with the work. It was solely based on discrimination and Retaliation.

> *"Retaliation in the workplace is if you make a complaint of discrimination, your employer is not allowed to retaliate against you in any way"*...

Listed below and attached in a separate ZIP.Flie is the organized evidence by issues stated, for review. The list of evidence falls into number order; listed by what the evidence is and any identifying details in each file.

**Exhibits: (Attachments Listed Below)**
Here's the link to get all the Evidence I would like to submit for my hearing. Due to the large number and size of files I had to create a link, for open access to allow easier transition through the hearing.
Please Note that the evidence is listed under each "Exhibits Numbers" the only issues are the videos, which could not be broken down...
https://drive.google.com/drive/folders/1YAVTuBHNf0n0KawIJPadhI5NwhUCAMNS?usp=sharing
Exhibits: (Attachments Listed Below)
- **Exhibits (1):** Recording from 1st Appeals Hearing from April 9th, entire recording.
- **Exhibits (2):** Recording from 1st Appeals Hearing from April 9th, Part One.
- **Exhibits (3):** Recording from 1st Appeals Hearing from April 9th, Part Two.
- **Exhibits (4):** Recording from 1st Appeals Hearing from April 9th, Part Three.
- **Exhibits (5):** Recording from 1st Appeals Hearing from April 9th, Part Four.
- **Exhibits (6):** Recording from 1st Appeals Hearing from April 9th, Part Five.
- **Exhibits (7):** Recording from 1st Appeals Hearing from April 9th, Part Six.
- **Exhibits (8):** Recording from Sophia R. Witness of Discrimination Charges from April 9th, Part Seven.
    https://photos.app.goo.gl/jfiXHdv3rZMHiL6RA  - 10 MINS.
    https://photos.app.goo.gl/d1CEJeKT1TN8FaT78  - 8 MINS.
- **Exhibits (9):** Sales Director Interview Confirmation Email.
- **Exhibits (10):** Sales Director Interview Resume Submission Confirmation
- **Exhibits (11):** Sales Director Interview Required Skills Test Confirmation
- **Exhibits (12):** Handbook Policy, on promotions with Opal Hotels if issues with discipline
- **Exhibits (13):** Google Reviews/ Witness Sworn Statements on character
- **Exhibits (14):** Screenshot image of phone call to hotel to C'Asia call being recorded
- **Exhibits (15):** Images from 2/12 proof of wrong date submitted for video for cash drop

- Exhibits (16): Cash Receipts, in violation of petty cash policy from GM. Emails Attached
- Exhibits (17): Flight Tickets / Baggage Claims proof that Write-up actions are false
- Exhibits (18): Screenshot images proof of communication with GM regarding shuttle use
- Exhibits (19): Screenshot images proof of communication Shuttle Driver shuttle use
- Exhibits (20): Screenshot images proof of communication with GM regarding shuttle
- Exhibits (21): Company memo posted regarding shuttle use. Proof that NO write-up was ever given.
- Exhibits (22): All original evidence for the 1st Appeals Hearing (106 Pages)/ Opal Appeal
- Exhibits 23): Emails submitted to HR about discrimination charges/harsh treatment.
- Exhibits (24): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (25): NOTICE TO CEASE AND DESIST - Defamation of Character – For Slander (False claims of receiving a 'Written Warning')
- Exhibits (26): (Subpoena Requested) In order to submit the Attorney's statements submitted to the EEOC concerning the 'Written Warning'.
- Exhibits (27): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (28): EEOC Charge Filed for Discrimination current status.
- Exhibits (29): EEOC Charge Filed for Discrimination communications forwarded to Civil
- Exhibits (30): Phone records, verify communication with C'Asia D. / Text Messages

# CHARGE FOR DISCRIMINATION: REBUTTAL EVIDENCE
## EEOC CHARGE NO. 443-2020-01961

Exhibits: (Attachments Listed Below | Summary of Each)

*Here's the link to get all the Evidence I would like to submit for my 'Rebuttal Statement'. Due to the large number and size of files I had to create a link, for open access to allow easier transition through the hearing. Note: The Evidence is listed under each "Exhibits Numbers" and goes with 18 Page Rebuttal.*
https://drive.google.com/drive/folders/1YAVTuBHNf0n0KawIJPadhI5NwhUCAMNS?usp=sharing

Exhibits: (Attachments Listed Below)

- Exhibits (1): Recording from 1st Appeals Hearing from April 9th, entire recording.
- Exhibits (2): Formal Request to withdraw DES Appeal, as a 'no show' and Email sent from HR
- Exhibits (3): Final Decision from DES for Unemployment Benefits Hearing (Received 08.15.20)
- Exhibits (4): Communication Issues Shuttle Driver Email – Sent 02.12.20
- Exhibits (5): Statements from Ops. Manager and Human Resources highlighting NO Written Warning Given
- Exhibits (6): Recording from Sophia R. Witness of Discrimination Charges, Part One. (Click on Links Below)
- Exhibits (7): Recording from Sophia R. Witness of Discrimination Charges, Part Two. (Click on Links Below)https://photos.app.goo.gl/jfiXHdv3rZMHiL6RA  - 10 MINS.
                    https://photos.app.goo.gl/d1CEJcKT1TN8FaT78 - 8 MINS.
- Exhibits (8): Recording from Sophia R. Witness of Discrimination Charges
- Exhibits (9): Sales Director Interview Confirmation Email.
- Exhibits (10): Sales Director Interview Resume Submission Confirmation
- Exhibits (11): Sales Director Interview Required Skills Test Confirmation
- Exhibits (12): Handbook Policy, on promotions with Opal Hotels if issues with discipline
- Exhibits (13): Google Reviews/ Witness Sworn Statements on character
- Exhibits (14): Screenshot image of phone call to hotel to C'Asia call being recorded
- Exhibits (15): Images from 2/12 proof of wrong date submitted for video for cash drop
- Exhibits (16): Cash Receipts, in violation of petty cash policy from GM. Emails Attached
- Exhibits (17): Flight Tickets / Baggage Claims proof that Write-up actions are false
- Exhibits (18): Screenshot images proof of communication with GM regarding shuttle use
- Exhibits (19): Screenshot images proof of communication Shuttle Driver shuttle use
- Exhibits (20): Screenshot images proof of communication with GM regarding shuttle
- Exhibits (21): Company memo posted regarding shuttle use. Proof that NO write-up was ever given.
- Exhibits (22): All original evidence for the 1st Appeals Hearing (106 Pages)/ Opal Hotels DES Appeal
- Exhibits 23): Emails submitted to HR about discrimination charges/harsh treatment.
- Exhibits (24): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (25): NOTICE TO CEASE AND DESIST - Defamation of Character – For Slander (False claims of receiving a 'Written Warning')
- Exhibits (26): (Subpoena Requested) In order to submit the Attorney's statements submitted to the EEOC concerning the 'Written Warning'.
- Exhibits (27): EEOC Charge Filed for Discrimination against Color, Hair, and sex.
- Exhibits (28): EEOC Charge Filed for Discrimination current status forwarded to DES.
- Exhibits (29): EEOC Charge Filed for Discrimination communications forwarded to Civil Division
- Exhibits (30): Phone records, verify communication with C'Asia D. / Text Messages